IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

JODY D. BACA,

    Plaintiff,

v.                                                                                                                                                           Civ. No. 15-02 SCY

CAROLYN W. COLVIN, Acting
Commissioner of the Social Security
Administration,

    Defendant.

**ORDER GRANTING PLAINTIFF'S MOTION TO REVERSE OR REMAND**

**THIS MATTER** is before the Court on Plaintiff Jody Baca's Motion to Reverse and Remand the Social Security Commissioner's final decision denying Plaintiff disability insurance benefits. ECF No. 22. For the reasons discussed below, the Court will grant Plaintiff's motion and remand this action to the Commissioner for further proceedings that are consistent with this opinion.

**I.**     **Background**

Plaintiff Jody Baca is a forty-eight-year-old man with long-standing intellectual limitations (he struggles to read or write) who suffers from a back injury and depression. ECF No. 15, Administrative Record ("AR") at 362. In 1986, Mr. Baca graduated from "School on Wheels," a special education high school in Albuquerque, New Mexico. AR 36, 46, 267. Since that time, he has held a variety of jobs. From 1997-2005, Mr. Baca owned his own paint and body shop, which he ran with his wife's help. Mr. Baca did the physical labor and his wife handled the paperwork, payroll, and records. AR 35-36, 47. When using a new product, Mr.

Baca would have a worker or his wife read him the instructions and draw pictures for his use. AR 55. Mr. Baca closed the shop in 2005 due to economic pressures. AR 363.

Between 2005-2011, Mr. Baca worked for a construction company, another paint and body shop, and a medical services company as an oxygen tank filler and mover. AR 36-37, 363. The lengths and dates of Mr. Baca's periods of employment are unclear. Mr. Baca appears to have reported that (1) he worked at the construction company – Darrel Julian Construction – from April 2006 to December 2007, (2) he next worked at the auto-shop – Southwest Collision Craftsmen – for roughly eighteen months, perhaps around 2010, and (3) he then worked at the medical services company – A&R Medical Supply – from February 2009 to July 2010. AR 36-37, 251, 268, 363. It is clear, however, that this information is inaccurate, at least in part.[1] Mr. Baca's "Detailed Earnings Query" (a report that appears to have been created based on tax data during the disability evaluation process) shows Mr. Baca receiving wages: (1) from Darrel Julian Construction and Southwest Collision Craftsmen in 2008 and (2) from A&R Medical Supply in 2011. AR 214. The only other income reported for any other year is self-employment income, with no income reported 2005-2007. AR 213-15.

The other evidence in the record suggests that the "Detailed Earnings Query" is likely more accurate than Mr. Baca's self-reports. Consistent with the "Detailed Earning Query," A&R Medical Supply completed a work activity questionnaire confirming that Mr. Baca did not begin working for them until February 22, 2011 and that his employment ended on September 7, 2011. AR 210. This report is, in turn, consistent with the medical records of Mr. Baca's treating

---

[1] At the hearing, Mr. Baca testified that he was "really bad with dates." AR 39.

2

physicians, which show that Mr. Baca injured his back in June 2011[2] while working for A&R Medical Supply. AR 336.

The record is not particularly well-developed regarding the nature of the work Mr. Baca did for each of these independent employers. Mr. Baca testified that he would move lumber for the construction company. AR 37; *see also* AR 252 (stating that he carried wood and that he used a saw and other hand tools). At the auto-body shop, he would "remove parts and put parts back on." AR 43. This did not involve any reading. *Id.* Finally, as an oxygen tank filler/driver, Mr. Baca cleaned tanks, moved them, and sometimes delivered them along with another employee. AR 36-37, 253. Mr. Baca indicated that this job involved "sum writing." AR 253.

On June 27, 2011, while attempting to move a liquid oxygen tank weighing approximately 800 pounds, Mr. Baca injured his back. AR 336. In the following months, he tried physical therapy and then injections to treat his lower back pain. *Id.* The physical therapy offered a roughly 10% improvement in his back, but the injections caused him to feel sick. *Id.* On October 11, 2011, Mr. Baca went to Dr. Miguel Pupiales at Pain Free New Mexico for treatment. *Id.* Dr. Pupiales diagnosed Mr. Baca with "intravertebral disc herniation with documented radicular symptoms at a single level." AR 332. Because Mr. Baca declined to proceed with any interventional procedures, Dr. Pupiales fitted Mr. Baca for a QuikDraw brace and scheduled a functional capacity evaluation to assess his permanent restrictions. AR 332-333. On December 2, 2011, Dr. Pupiales released Mr. Baca to work with the following permanent restrictions:

> He is placed under light work restrictions; 25 lbs maximum with frequent lifting and/or carrying of objects weighing up to 10 lbs. In an 8 hour day he can stand for 1 hour continuously but will require rest period for stretching. He can sit for 1 hour continuously and would require rest period for stretching for a couple of minutes, as well as driving for 1 hour continuously. He can bend as tolerated, squat as tolerated. He is not able to climb

---

[2] In his report, John Owen, Ph.D. writes that Mr. Baca was injured in August 2011. AR 363. It strikes the Court that relying on the self-reports of a claimant with recognized cognitive limitations is bound to lead to this type of confusion.

3

ladders, but stairs occasionally, twisting occasionally, overheard reaching occasionally, crawling occasionally.

AR 330; *see also* AR 326 (reiterating Mr. Baca's restrictions on a fill-in-the-blank form).

Roughly one year later, at the request of the state disability office, Mr. Baca underwent two disability determination examinations. On November 3, 2012, Mr. Baca met with Dr. Raul Neftali Young-Rodriguez. AR 356. Dr. Young-Rodriguez reviewed Mr. Baca's medical and social history and conducted a physical examination. AR 356-358. Dr. Young-Rodriguez concluded that there was "clinical medical evidence . . . to support moderate to severe limitation of activity involving the lumbar spine." AR 358. He noted in his impression section that in addition to suffering from a back injury, arthritis, depression, and bipolar, Mr. Baca was illiterate. *Id.*

Two days later, on November 5, 2012, Mr. Baca went to an appointment with John Owen, Ph.D. to complete a psychological examination. AR 362. Dr. Owen administered both a Wechsler Adult Intelligence Scale-III and a Mini-Mental State Examination. *Id.* Mr. Baca scored a 25/30 on the Mini-Mental State Examination. AR 364. His IQ scores came back as follows:

| | |
|---|---|
| Verbal IQ | 60 (.4%ile) |
| Performance IQ | 63 (1st %ile) |
| Full Scale IQ | 58 (.3%ile) |
| Verbal Comprehension Index | 63 (1st %ile) |
| Perceptual Organization Index | 62 (1st %ile) |
| Working Memory Index | 51 (.1%ile) |

AR 364. Dr. Owen explained that these results placed Mr. Baca in the mild mental retardation range and were probably "indicative of his adaptive functioning." AR 363-364. Dr. Owen indicated that this was consistent with his impressions from talking with Mr. Baca. Specifically, Dr. Owen noted that Mr. Baca, while cooperative, had difficulty understanding certain questions and instructions. AR 363. He concluded that Mr. Baca "clearly has some cognitive deficits." AR

4

364. He found that Mr. Baca had moderate to marked difficulty understanding and remembering detailed or complex instructions, carrying out instructions, attending to and concentrating on tasks, and adapting to change in the workplace. AR 364-365.

## II.     Procedural History

On July 2, 2012, Mr. Baca filed an application for disability insurance benefits, alleging a disability start date of June 27, 2011. AR 14. After his claim was denied on initial review and upon reconsideration, his case was set for a hearing in front of Administrative Law Judge ("ALJ") Ann Farris. On July 25, 2014, the ALJ issued a written decision finding that Mr. Baca suffered from three severe impairments: degenerative disc disease of the lumbar spine, major depressive disorder, and borderline intellectual functioning. AR 16. She concluded, however, that Mr. Baca was not disabled. AR 23. Mr. Baca appealed this decision to the Social Security Appeals Council and the Appeals Council denied the request for review. AR 1-6. This appeal followed. ECF No. 22.

## III.    Applicable Law

### A.  Disability Determination Process

A claimant is considered disabled for purposes of Social Security disability insurance benefits if that individual is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Commissioner has adopted a five-step sequential analysis to determine whether a person satisfies these statutory criteria. *See* 20 C.F.R. § 404.1520. The steps of the analysis are as follows:

(1) Claimant must establish that she is not currently engaged in "substantial gainful activity." If Claimant is so engaged, she is not disabled and the analysis stops.

(2) Claimant must establish that she has "a severe medically determinable physical or mental impairment . . . or combination of impairments" that has lasted for at least one year. If Claimant is not so impaired, she is not disabled and the analysis stops.

(3) If Claimant can establish that her impairment(s) are equivalent to a listed impairment that has already been determined to preclude substantial gainful activity, Claimant is presumed disabled and the analysis stops.

(4) If, however, Claimant's impairment(s) are not equivalent to a listed impairment, Claimant must establish that the impairment(s) prevent her from doing her "past relevant work." Answering this question involves three phases. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ considers all of the relevant medical and other evidence and determines what is "the most [claimant] can still do despite [her physical and mental] limitations." 20 C.F.R. § 404.1545(a)(1). This is called the claimant's residual functional capacity ("RFC"). *Id.* § 404.1545(a)(3). Second, the ALJ determines the physical and mental demands of Claimant's past work. Third, the ALJ determines whether, given Claimant's RFC, Claimant is capable of meeting those demands. A claimant who is capable of returning to past relevant work is not disabled and the analysis stops.

(5) At this point, the burden shifts to the Commissioner to show that Claimant is able to "make an adjustment to other work." If the Commissioner is unable to make that showing, Claimant is deemed disabled. If, however, the Commissioner is able to make the required showing, the claimant is deemed not disabled.

*See* 20 C.F.R. § 1520(a)(4); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005).

### B.  Standard of Review

A court must affirm the denial of social security benefits unless (1) the decision is not supported by "substantial evidence" or (2) the ALJ did not apply the proper legal standards in reaching the decision. 42 U.S.C. § 405(g); *Casias v. Sec'y of Health & Human Serv.*, 933 F.2d 799, 800-01 (10th Cir. 1991).  In making these determinations, the reviewing court "neither reweigh[s] the evidence nor substitute[s] [its] judgment for that of the agency.'" *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008). For example, a court's disagreement with a decision is immaterial to the substantial evidence analysis. A decision is supported by substantial evidence as long as it is supported by "relevant evidence . . . a reasonable mind might accept as

adequate to support [the] conclusion." *Casias*, 933 F.3d at 800. While this requires more than a mere scintilla of evidence, *Casias*, 933 F.3d at 800, "[t]he possibility of drawing two inconsistent conclusions from the evidence does not prevent [the] findings from being supported by substantial evidence." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citing *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

Similarly, even if a court agrees with a decision to deny benefits, if the ALJ's reasons for the decision are improper or are not articulated with sufficient particularity to allow for judicial review, the court cannot affirm the decision as legally correct. *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). As a baseline, the ALJ must support his or her findings with specific weighing of the evidence and "the record must demonstrate that the ALJ considered all of the evidence." *Id.* at 1009-10. This does not mean that an ALJ must discuss every piece of evidence in the record. But, it does require that the ALJ identify the evidence supporting the decision and discuss any probative and contradictory evidence that the ALJ is rejecting. *Id.* at 1010.

## IV.   Analysis

Mr. Baca maintains that the ALJ erred at step three when she determined that Mr. Baca was not conclusively disabled under the listing for claimants with intellectual disabilities: Listing 12.05, 20 C.F.R., pt. 404, subpt. P, App. 1, § 12.05.[3] To qualify as presumptively disabled under this Listing, a claimant must satisfy the Listing's capsule definition as well as meeting one of its four severity prongs. The capsule definition limits the Listing to claimants with:

> significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

---

[3] In his motion to reverse or remand, Mr. Baca also raised a challenge to the ALJ's findings regarding the number of certain jobs in the national economy. ECF No. 22 at 14-15. Mr. Baca, however, has withdrawn this argument, acknowledging that it lacked merit. ECF No. 27 at 1. Thus, the Court need not address it. The only remaining issue for the Court's consideration is the alleged step-three error.

*Id.* The Listing then explains that:

> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> A. . . .
>
> B. A valid verbal, performance, or full scale IQ of 59 or less;
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function; [or]
>
> D. . . .

*Id.* The ALJ found that Mr. Baca did not qualify under this Listing because (1) "the evidence fails to support deficits in adaptive functioning prior to age 22," and (2) while Dr. Owen found that Mr. Baca had a full scale IQ of 58, the ALJ rejected this score and concluded that Mr. Baca "does not have a valid verbal, performance or full-scale IQ score of 58, or 60-70 with another physical or mental impairment imposing additional and significant work related limitations." AR 18, 21. According to Mr. Baca, his IQ scores qualify him for benefits under Listing 12.05(B) and 12.05(C) and the ALJ erred in making the above findings. ECF No. 22 at 13.

### 1. *The Capsule Definition – Adaptive Functioning*

The capsule definition poses the first hurdle to claimants seeking to obtain benefits under Listing 12.05. To clear this hurdle a claimant must show: (1) that he suffers from significantly subaverage general intellectual functioning and (2) that his deficits in adaptive functioning initially manifested before age 22. The ALJ never addressed the first requirement, *see generally* AR 14-23, and the Commissioner "does not dispute that [Mr. Baca] has significant intellectual limitations." ECF No. 26 at 11. Consequently, the only issue facing the Court with regard to the capsule definition is the validity of the ALJ's findings with regard to Mr. Baca's adaptive functioning.

The Court agrees with Mr. Baca that these findings are deficient. During her step-four analysis (as opposed to her step-three analysis), without any explanation, the ALJ simply asserted that Mr. Baca did not experience deficits in adaptive functioning during the relevant time period. AR 21. The Commissioner defends this finding by pointing to Mr. Baca's home life, work history, and personal assessments. ECF No. 26 at 10-11. The thrust of the Commissioner's argument is that Mr. Baca has "led a full life and exercised plenty of personal independence and social responsibility." *Id.* at 10. Like the ALJ, the Commissioner simply dismisses the import of Mr. Baca's academic and cognitive limitations without any explanation for why they are insignificant. *Id.* The problems with this position are twofold.

First, a district court "may not create or adopt post-hoc rationalizations to support the ALJ's decision that are not apparent from the ALJ's decision itself." *Haga v. Astrue*, 482 F.3d 1205, 1207-1208 (10th Cir. 2007); *see also Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004)*; Dye v. Barnhart*, 180 F. App'x 27, 30-31 (10th Cir. 2006).[4] Here, the ALJ did not define adaptive functioning, discuss the evidence with regard to Mr. Baca's long-standing mental and academic limitations, or otherwise explain why these limitations do not constitute deficits in adaptive functioning that manifested before Mr. Baca turned 22 years old. This is problematic because Listing 12.05 does not define "deficits of adaptive functioning" and the Commissioner has indicated that ALJs should consider "the measurement methods recognized and endorsed by . . . professional organizations" in interpreting this term. 67 Fed. Reg. 20,018, 20,022 (Apr. 24,

---

[4] The Court cites unpublished opinions in this Order. The Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. *See* 10th Cir. R. 32.1(A) ("Unpublished opinions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored . . . . However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision." *United States v. Austin*, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court finds that the unpublished opinions it has cited have persuasive value with respect to a material issue, and will assist the Court in its proposed disposition of this case.

2002); *see also Barnes v. Barnhart*, 116 F. App'x 934, 942 (10th Cir. 2004). In the briefing, the Commissioner provides two divergent definitions of "adaptive functioning:"

> Adaptive functioning is defined as "the individual's progress in acquiring mental, academic, social and personal skills as compared with other unimpaired individuals of his/her same age." Program Operations Manual System (POMS) DI 24514.056(D)(2). The Diagnostic and Statistical Manual of Mental Disorders (DSM) provides further explanation: "Deficits in adaptive functioning . . . refer to how well a person meets community standards of personal independence and social responsibility, in comparison to others of similar age and socioeconomic background." DSM 37 (5th ed. 2013).

ECF No. 26 at 10. The Court, however, has no way of knowing whether the ALJ was guided by these definitions, or some entirely different definition. For instance, it is possible that that the ALJ viewed personal responsibility, rather than scholastic skills, as the hallmark of "adaptive functioning" and ruled against Mr. Baca on this basis. Alternatively, it is possible that the ALJ included mental and academic skills as part and parcel of adaptive functioning, but felt that Mr. Baca was not sufficiently behind in these areas to qualify as deficient. Because the ALJ did not provide any explanation for her findings regarding Mr. Baca's adaptive functioning, the Court has nothing tangible to review.

Second, even if the Court was willing to entertain the Commissioner's post hoc arguments regarding Mr. Baca's adaptive functioning, the Court is not persuaded that the evidence supports the ALJ's conclusion. It is undisputed that (1) Mr. Baca went to a special education high school and (2) he has never been able to read or write above the level of a young child. This evidence strongly suggests that Mr. Baca significantly lagged behind his peers in the areas of academics, reading, and writing. These are not trivial matters. Consequently, the Court cannot find that the ALJ's barebones finding was clearly supported by substantial evidence. In other words, this is not a clear-cut case where an ALJ's lack of analysis is immaterial because the record clearly demonstrates that the claimant did not qualify for a particular listing. The Court

will reverse the ALJ's unsupported finding that Mr. Baca did not manifest deficits in adaptive functioning prior to age 22 and remand for further consideration of this issue. The result of this ruling is that the validity of the ALJ's step-three analysis depends on her rejection of Mr. Baca's IQ scores as valid scores under subsections (B) and (C).

### 2. *The ALJ's Rejection of Mr. Baca's IQ Scores*

In addition to finding that Mr. Baca did not satisfy the capsule definition, the ALJ found that Mr. Baca did not qualify for benefits under Listing 12.05(B) or (C) because he did not meet the IQ cutoffs for these Listings. In reaching this decision, the ALJ acknowledged that Mr. Baca's IQ scores were within the required range, but she rejected the IQ scores as inconsistent with Mr. Baca's work history and the records of his treating physicians. Mr. Baca challenges this decision as an improper substitution of the ALJ's opinion for the medical evidence. This is a close case.

In *Lax v. Astrue*, 489 F.3d 1080, 1081 (10th Cir. 2007), the Tenth Circuit held that "making factual determinations on the validity of an IQ score is within the province of an ALJ and will be upheld when supported by substantial evidence." *Id.* at 1081. In other words, when deciding whether to accept or reject an IQ score, it is permissible for an ALJ to consider evidence in the record that would undermine the score, including evidence that the claimant's historic capabilities are inconsistent with a finding of mental retardation. *Id.* at 1088. The district court reviews such findings under the deferential "substantial evidence" standard. *Id.* at 1089. As long as the decision to reject an IQ score is supported by evidence "a reasonable mind might accept as adequate to support [the] conclusion," the decision is valid. *Casias*, 933 F.3d at 800.

The parties vigorously dispute the strength of the evidence supporting the ALJ's rejection of Mr. Baca's IQ scores. Mr. Baca emphasizes his special education course work, his undisputed

11

inability to read or write, and his need for assistance to complete basic tasks (like writing checks).[5] On the other hand, the Commissioner focuses on Mr. Baca's work history, which it deems inconsistent with Mr. Baca's IQ results. The Commissioner characterizes Mr. Baca's work history as revealing an ability to "hold down jobs with independent employers for a significant period of time, working as a driver and tank filler, as a general laborer, and in other auto body shops." ECF No. 26 at 9. Mr. Baca disputes this depiction, which he believes overstates the length of his employment and downplays the accommodations he received in order to help operate a family-owned paint and body shop. ECF No. 27 at 2-7.

Neither party has identified any analogous Tenth Circuit case law to guide the Court's analysis. The only Tenth Circuit case the Commissioner cites to support its position is *Lax*, 489 F.3d 1080. While *Lax* articulates the legal standard that governs the parties' dispute, it is otherwise of limited assistance because it is factually distinguishable from the case at hand. In *Lax*, the ALJ rejected a claimant's IQ results, among other reasons, because (1) the clinicians who administered the test opined that the claimant only made minimal efforts during the testing process, missing easy questions while correctly answering more difficult questions, (2) as a result, the clinicians questioned the validity of the tests and furthermore expressed the opinion that the claimant did not present as intellectually limited as the tests would suggest, (3) the claimant's treating physician noted that he appeared to be of average intelligence, and (4) the claimant's testimony about his limitations was not consistent or credible. *Id.* at 1087-1089. All of this evidence provided a sound basis for the ALJ to reject the IQ scores.

In this case, however, there is no evidence that Dr. Owen, the IQ administrator, ever questioned the IQ results. Nor is there anything in Dr. Owen's report to suggest the results were otherwise unreliable. To the contrary, Dr. Owen noted that Mr. Baca was "cooperative during the

---

[5] At the hearing, Mr. Baca testified that he does not know how to write a check. AR 36.

examination." AR 363.[6] Moreover, Dr. Owen independently verified that Mr. Baca had difficulty understanding certain questions and instructions and "clearly has some cognitive deficits." AR 363-364. Thus, this case presents a very different scenario than the leading Tenth Circuit cases upholding the rejection of IQ scores. *See Lax*, 489 F.3d 1080; *see also Flores v. Astrue*, 285 F. App'x 566, 569 (10th Cir. 2008) (report accompanying IQ results, "made clear" that the certified educational diagnostician believed the results were not consistent with the claimant's "developmental history and degree of functional limitation").

Here, the ALJ's rejection of Mr. Baca's IQ results rests entirely on her determination these results conflicted with (1) the other medical evidence in the record and (2) Mr. Baca's daily functioning and work history. The entirety of the ALJ's analysis reads as follows:

> Dr. Owen's opinion contradicts sharply the opinions of the other treating and examining physicians and is inconsistent with the claimant's overall daily functioning. The claimant has a long history of working at skilled and semi-skilled jobs and had owned and managed his own business. His past work history is clearly not consistent with a mildly mentally retarded individual. Thus, while I am considering Dr. Owen's opinion, I given greater weight to the opinions of the other treating and examining physicians in the record and the claimant's demonstrated ability to perform skilled and semi-skilled jobs.

As Mr. Baca repeatedly points out, however, the ALJ's reliance on "the opinions of the other treating and examining physicians" is completely unwarranted. Without providing any citations or descriptions, the ALJ insists that these opinions are inconsistent with Dr. Owen's findings. It is possible to interpret this inconsistency one of two ways. First, the most natural reading of the ALJ's decision is that Mr. Baca's treating and examining physicians expressed the opinion that

---

[6] Dr. Young-Rodriguez also noted that Mr. Baca was cooperative. AR 358. Similarly, Dr. Pupiales, one of Mr. Baca's treating physicians, noted in his treatment records that Mr. Baca was "very cooperative" and "exerts excellent effort on all physical examination requests, and there are no signs of symptom exaggeration, symptom magnification, or inappropriate illness behavior." AR 331. All in all, the record indicates that Mr. Baca was an honest patient, not a malingerer.

13

Mr. Baca was not mildly mentally retarded. This, however, is simply not the case.[7] As best the Court can tell, other than Dr. Owen, no other medical provider expressed an opinion about Mr. Baca's cognitive limitations. Dr. Young-Rodriguez, the consulting physician who conducted Mr. Baca's physical examination, confirmed that Mr. Baca was illiterate. AR 358. Otherwise, the remaining medical records are entirely silent regarding the extent or cause of Mr. Baca's intellectual deficits.[8]

Given this state of affairs, it is possible the ALJ simply meant to point out that the other treating and examining medical providers did not indicate that Mr. Baca was mildly mentally retarded. If so, this was not a valid basis for rejecting Dr. Owen's report and IQ results. *Harrold v. Astrue*, 299 F. App'x 783, 787 (10th Cir. 2008) ("The Appeals Council also relied on the fact that none of Mr. Harrold's treating physicians noted observations consistent with a diagnosis of mental retardation. We conclude that this is also an insufficient reason for rejecting Dr. Bryant's opinion or the IQ scores. . . . [N]one of Mr. Harrold's doctors were treating him for any problems directly related to his cognitive abilities."). Similar to *Harrold*, these providers were

---

[7] The Court notes that *the non-treating*, *non-examining* agency consultants opined that Mr. Baca's IQ results were "inconsistent with his level of functioning, especially since [Mr. Baca] reported having owned his own business." AR 69-70. While the ALJ remarked that her conclusion was consistent with this determination, she did not directly cite the agency opinions as evidence to support her rejection of Dr. Owen's IQ results. The Court does not consider the agency opinions as substantial evidence supporting the ALJ's rejection of the IQ results because (1) opinions of non-examining consultants are generally entitled to less weight that examining consultants, 20 C.F.R. § 404.1527, (2) the non-examining consultants did not have the benefit of the hearing testimony regarding the nature of Mr. Baca's prior employment and the significant assistance his wife provided in managing Mr. Baca's paint and body shop, (3) the non-examining consultants found Dr. Owen's opinion and IQ results partially credible, thereby acknowledging that Mr. Baca suffers from cognitive limitations. AR 69-70.

[8] In his report, under the heading "neurologic," consultant examiner Dr. Young-Rodriguez stated that Mr. Baca displayed "no evidence of a mental abnormality." AR 358. The Court does not construe this as a statement about the presence or extent of Mr. Baca's intellectual limitations. Dr. Young-Rodriguez confirmed that Mr. Baca was illiterate. He did not otherwise opine about Mr. Baca's non-exertional limitations. The primary focus of his examination was clearly Mr. Baca's physical health. The Commissioner does not point to this statement to support its position and does not appear to construe this statement as a declaration that Mr. Baca is intellectually normal. To the contrary, the Commissioner acknowledges Mr. Baca's intellectual limitations, but simply claims they are not as serious as Dr. Owen found.

not treating or evaluating Mr. Baca for his cognitive limitations; they were treating him for physical ailments, like back pain, and emotional struggle, like depression. Thus, their failure to mention Mr. Baca's intellectual limitations does not provide a sound reason for rejecting the opinion of Dr. Owen, the consultant who tested and evaluated these limitations.

The Commissioner tacitly acknowledges this fact. In the Response, the Commissioner never discusses the ALJ's determination that the opinions of the other treating and examining physicians undermine Dr. Owen's findings. Instead, the Commissioner argues that Mr. Baca's work history is enough "in and of itself" to "question the validity of his low IQ scores." ECF No. 26 at 10. This argument stands on firmer legal ground. The Tenth Circuit has recognized that a claimant's proven ability to do semi-skilled work may be inconsistent with mental retardation. *Bland v. Astrue*, 432 F. App'x 719, 723 (10th Cir. 2011).

The ALJ's characterization of Mr. Baca's work history, however, is open to attack. The ALJ found that Mr. Baca had a "long history of working at skilled and semi-skilled jobs and had owned and managed his own business." This very brief summary prioritizes labels and preconceived conclusions over real analysis of Mr. Baca's work history. The ALJ does not make any findings about the dates of Mr. Baca's employments, which are very unclear from the record, perhaps due to Mr. Baca's trouble remembering and accurately reporting dates. Nor does the ALJ engage in a thorough discussion of what Mr. Baca actually did at work or his role in the family owned business that he owned. As far as the record shows, Mr. Baca's prior employment primarily involved manual labor. Within the business he owned, he relied heavily on his wife and co-workers to complete tasks that required reading and writing skills. It is not clear to the Court that this type of employment history is inconsistent with mild mental retardation.[9] Such a

---

[9] The Court notes that the ALJ's opinion suffers from some internal inconsistency. The ALJ found that Mr. Baca's "long history of working at skilled and semi-skilled jobs" provided a sound basis for rejecting

15

finding is particularly suspect in a case like this one where the doctor who found the claimant to be mildly mentally retarded was aware of the claimant's work history and did not express an opinion that this history was inconsistent with low mental functioning. *See Harrold*, 299 F. App'x at 788.

In *Harrold*, the Tenth Circuit determined that an ALJ improperly rejected the claimant's low IQ scores as inconsistent with the claimant's "extensive prior work history as a maintenance supervisor and maintenance technician." The Tenth Circuit confirmed that this work history was "highly probative of [the claimant's] cognitive abilities," but found that it did not provide a proper basis for rejecting a doctor's IQ scores and mild-retardation opinion when the doctor had not questioned the scores, the doctor found that the claimant did not malinger during the test, and the doctor expressed the opinion that the prior work history was not inconsistent with the diagnosis. Although *Harrold* is unpublished and therefore non-binding, the factual similarity between *Harrold* and this case increases its persuasive value. One factual distinction is that Dr. Owen never expressed a direct opinion about any potential conflict between the IQ results and Mr. Baca's work history. Nonetheless, Dr. Owen was familiar with Mr. Baca's work history (which he summarized within his report) and, in spite of this work history, found that Mr. Baca was a cooperative patient who clearly suffered cognitive deficits. AR 363-364. Thus, *Harrold* suggests the ALJ's decision in this case was not supported by substantial evidence.

The Commissioner's strongest argument to the contrary is that the ALJ properly determined that Mr. Baca's work history precludes a finding that Mr. Baca is so intellectually disabled that he is unable to perform any work as a matter of law. ECF No. 26 at 9-10. The Commissioner emphasizes that the Listings treat all intellectually disabled claimants with a full

---

his low IQ scores. At the same time, however, the ALJ indicated that she was putting great weight on the non-examining consultants who opined that Mr. Baca was only capable of simple, unskilled work. AR 21.

scale IQ of 59 or lower as presumptively disabled. Because Mr. Baca was able to work for many years at his own paint and body shop, it would seem inappropriate to group him within this class. The Court finds that this argument could sway a reasonable mind and, therefore, the ALJ's rejection of Mr. Baca's full scale IQ score of 58 is supported by substantial evidence (even if by the barest of margins).

This analysis, however, only applies to the rejection of Mr. Baca's full scale IQ score of 58. Mr. Baca's verbal score of 60 and performance score of 63 would not qualify him for automatic benefits under Listing 12.05(B). They would, however, qualify him for benefits under Listing 12.05(C) because the ALJ found he also suffers from a severe physical impairment – degenerative disc disease. *Bland*, 432 F. App'x at 722 (a finding that a claimant suffers a severe impairment at step two normally satisfies Listing 12.05(C)'s requirement of a significant work-related limitation). The Court does not see the conflict between this result and Mr. Baca's work history, which stopped when Mr. Baca injured his back and was no longer able to engage in the kind of manual labor that comprised his past work. For this reason, the Court finds that, even if the ALJ's rejection of the full scale IQ score was acceptable, the ALJ's rejection of Mr. Baca's higher verbal and performance IQ scores was not supported by substantial evidence. As a result, the Court will reverse this decision and remand for further proceedings.

Because the Court is reversing and remanding the ALJ's decision with regard to Listing 12.05(C), the Court strongly encourages the ALJ to reconsider and correct the analysis of Listing 12.05(B) in accordance with *Harrold*. In other words, the ALJ should consider whether Mr. Baca's work history, standing alone, warrants the rejection of the full scale IQ score, especially given the information in the record about the limited role Mr. Baca played managing his paint and body shop.

### 3. *The ALJ's Failure to Order a Second IQ Test*

Because the Court's reversal of the ALJ's findings was a close call, the Court will also address Mr. Baca's alternative argument in favor of reversal. Mr. Baca claims that, even if the ALJ did not commit error in rejecting Dr. Owen's IQ test, by not ordering a second IQ test, the ALJ neglected her duty to develop the record. As Mr. Baca forcefully argues, "administrative disability hearings are nonadversarial and the ALJ has a duty to ensure that an adequate record is developed during the disability hearing consistent with the issues raised." *Wall v. Astrue*, 561 F.3d 1048, 1062-1063 (10th Cir. 2009) (internal citation omitted). While this duty is not unlimited and an ALJ need not exhaust all possible avenues of inquiry, when a claimant raises an issue that is substantial on its face, the ALJ has a duty to ensure that there is sufficient evidence to rule on this issue. *Id.* at 1063.

Here, Mr. Baca argued to the ALJ that he was entitled to benefits under Listing 12.05(C). AR 34. In addition, he presented sufficient evidence to put the ALJ on notice that there was a substantial possibility that he might qualify under this listing. This evidence included Dr. Owen's report and his own testimony about his work history and inability to read or write above a childhood level. While the ALJ rejected this evidence in part, she did not have grounds to fully disregard it. In fact, the Commissioner acknowledges Mr. Baca's intellectual deficits and the non-examining consultants, on whom the ALJ placed the most reliance, partially credited Dr. Owen's report. AR 69-70. Thus, even if the ALJ did not err in finding that Dr. Owen's IQ test results understated Mr. Baca's intellectual functioning, she could not automatically presume that Mr. Baca's IQ would fall above the 70 point threshold for consideration for benefits under Listing 12.05(C). In other words, the record indicates that, even if Dr. Owen's IQ results were somewhat lower than expected, there is a substantial chance that Mr. Baca's IQ was within the

60-70 point range that would qualify him for disability benefits under Listing 12.05(C). Because this issue was clearly presented for her analysis, the ALJ had a duty to develop evidence of Mr. Baca's IQ. Simply assuming Mr. Baca's IQ is not within the 60-70 range is not a finding that can be supported based on the evidence.

   **IT IS THEREFORE ORDERED** that Plaintiff's Motion to Reverse and Remand (ECF No. 22) is granted. The Commissioner's denial of Plaintiff's claim for disability benefits is reversed and the case is remanded for further proceedings that are consistent with this opinion.

_____
UNITED STATES MAGISTRATE JUDGE